**Jonathan Stone, ESQ, CPA, MST, LLC**
**Jonathan Stone, Esquire**
**490 Schooley's Mountain Road–Bldg. 3A**
**Hackettstown, New Jersey 07840–4002**
**Tel. (908) 979–9919 / Fax. (908) 979–9920**
jonathan@jonstonelaw.com
**Attorney for Debtor**

|  |  |
|---|---|
| In re:<br><br>**Diana Kemp,**<br><br>       Debtor. | **UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY**<br><br>**Honorable Stacey L. Meisel, U.S.B.J.**<br><br>**Chapter 13**<br><br>**Case No. 25–16553 (SLM)**<br><br>**Hearing Date: November 13, 2025**<br><br>**Hearing Time: 10:00 am**<br><br>**CERTIFICATION OF COUNSEL IN SUPPORT OF MOTION FOR LEAVE TO WITHDRAW AS ATTORNEY FOR DEBTOR** |

Jonathan Stone, of full age, hereby certifies as follows:

1.  **Introduction and Standing:** I, Jonathan Stone, am an attorney at law duly admitted in the State of New Jersey and before this Court. I am the attorney of record for debtor Diana Kemp in this Chapter 13 bankruptcy case. I submit this Certification in support of my motion for leave to withdraw as counsel for Ms. Kemp. I have personal knowledge of the facts set forth herein, and if called as a witness, I could testify competently thereto.

2.  **Representation of Diana Kemp and Related Case:** I have represented Diana Kemp as her bankruptcy counsel since June 21, 2025. Diana Kemp is the mother of Lisa Ann Filippini, whom I also represented in a related Chapter 13 case (Case No. 25-16171 (JKS)) until recently – a separate motion to withdraw as Ms. Filippini's counsel is pending. Ms. Filippini

owns and operates a New Jersey dog grooming business known as *Lisa's Priceless Pets, LLC*. A creditor, Shannon Reilly, has asserted that Diana Kemp owns a 50% interest in Lisa's Priceless Pets, LLC. However, at the §341 Meeting of Creditors in her daughter's bankruptcy on September 4, 2025, Lisa Filippini testified under oath that she is the sole owner of that business. This testimony is corroborated by the official Certificate of Formation on file with the New Jersey Secretary of State, which lists only Lisa Filippini as the owner. The §341 Meeting of Creditors in Diana Kemp's case was conducted on September 18, 2025.

3. **Lisa Filippini's Forgery (October 4, 2025) – Discovery of Fraudulent Letter:** On or about October 11, 2025, I learned that Lisa Ann Filippini had caused a letter to be delivered to one of her former employees, **Shirley DePaola**, on or about October 4, 2025, which fraudulently bore **my name and signature**. The letter was handed to Ms. De Paola by an employee of Lisa's Priceless Pets at Ms. Filippini's direction, and it appeared to come from me as "Attorney for Lisa's Priceless Pets." Prior to October 11, I had absolutely **no knowledge** of this letter's existence.

4. I emphatically state that I had **no involvement whatsoever** in authoring or sending the October 4, 2025 letter to Ms. DePaola. Specifically:

- I did not write this letter.

- I did not review or approve this letter.

- I did not authorize this letter to be sent.

- I had no knowledge of this letter before its delivery to Ms. De Paola.

- I did not give anyone permission to use my name or signature on any communication to Ms. De Paola (or anyone else) regarding this matter.

A true and correct copy of this fraudulent letter (the "Forged Letter") is attached as **Exhibit A** to

2

this Certification.

5. **Content of the Forged Letter:** The letter (Exhibit A) is addressed to "Shirley De Paol" *[sic]* (misspelling the recipient's name) and purports to have been written and signed by me as "Attorney for Lisa's Priceless Pets." In reality, I do not represent **Lisa's Priceless Pets, LLC** as an entity at all – I represent Lisa Ann Filippini *personally* in her bankruptcy. The forged letter contains several outrageous statements and threats, including:

- Assertions about Ms. De Paola's former employment at Lisa's Priceless Pets and disparagements of her work performance, education, and attitude;

- A threat directed at Ms. De Paola: "If you continue to place defamatory comments against Lisa's Priceless Pets Miss Filippini will file charges against you";

- A claim that "We have witnesses and cameras of every day activity also your comments";

- An insistence that "Lisa's Priceless Pets paid you exactly according to the law";

- A closing falsely signed, "Sincerely Yours, Jonathan Stone, Attorney for Lisa's Priceless Pets."

6. The tone and presentation of the letter make it immediately clear that it was **not written by an attorney**. It is riddled with grammatical errors, run-on sentences, missing punctuation, and unprofessional language – phrasing I would never use in any correspondence. The letter lacks proper letterhead, contact information, or any hallmarks of legitimate legal correspondence. Any attorney (or even a layperson) reviewing this document would recognize that no licensed lawyer drafted it.

7. **Circumstances of the Forgery:** The sequence of events on October 4, 2025 was orchestrated by Ms. Filippini. At approximately 12:00 p.m. that day, Lisa Filippini contacted Ms. De Paola and directed her to come to the Lisa's Priceless Pets business location to retrieve some

3

personal items. When Ms. De Paola arrived, a current employee of Lisa's Priceless Pets handed her an envelope. Inside the envelope was the forged letter described above. In other words, Ms. Filippini **set up** the delivery of this fraudulent letter to her former employee under false pretenses.

8. **Lisa Filippini's Admission of Guilt:** After discovering the existence of this fraudulent letter, I immediately confronted Lisa Filippini about it and inquired how such a letter came to bear my name. In response, Ms. Filippini admitted to me that **she had orchestrated the entire scheme**. She confessed that:

- She requested her certified public accountant, Larry Stetze (a non-lawyer), to draft the letter on her behalf;

- Mr. Stetze complied and gave the completed letter to Ms. Filippini;

- Ms. Filippini then caused the letter to be delivered to Ms. De Paola through her employee, as described above.

9. Ms. Filippini knew or certainly **should have known** that what she did was wrongful and fraudulent. In particular, she knew or was reckless in not knowing that:

- I had not authorized any such letter;

- Using my name without permission is fraudulent and improper;

- The letter contained a direct threat of legal action against a third party (Ms. De Paola) under my name;

- This conduct constitutes forgery and attorney impersonation in violation of New Jersey criminal law.

10. **Lisa Filippini's October 12, 2025 Text Message – Continued Dishonesty:** Notwithstanding her admissions to me on October 11, Lisa Filippini subsequently attempted to **downplay or obfuscate** her misconduct. On October 12, 2025 at 12:33 p.m., Ms. Filippini sent

me a text message that feigned confusion about the situation. In this message, she purported not to "understand what all that stuff was about," suggested that her accountant had sent "it" only to her (not to me), and implied that she had merely forwarded me some tax returns. She concluded by saying, "I didn't think there was anything wrong with that… I'm a little confused." A screenshot of this text message is attached as **Exhibit B**.

11. The October 12 text message stated, in part: *"Hey Jonathan, I'm home from the hospital. I don't understand what all that stuff was about… my account[ant] sent it to me. He did not send anything to you. I just sent you some tax returns. I didn't think there was anything wrong with that… how else am I supposed to send you things so I'm a little confused."* (Exhibit B).

12. This text message clearly shows Ms. Filippini attempting to **rewrite the narrative** after the fact. It demonstrates that she:

- Tried to create a false record suggesting she didn't realize anything was amiss ("doesn't understand what the problem is");

- Conflated a legitimate act (sending me tax return documents) with the fraudulent letter, as if they were one and the same, to make her actions seem innocuous;

- Feigned confusion about conduct that she had already explicitly admitted to orchestrating just a day prior;

- Potentially sought to dissuade or influence me, as her attorney, from taking action by implying that this was all a misunderstanding;

- Continued to be untruthful, in a manner that could be seen as an attempt to cover up or even obstruct justice.

13. In short, the October 12, 2025 text message is evidence of Ms. Filippini's **consciousness of guilt**. Having realized the gravity of her actions, she attempted to muddy the waters and minimize her culpability through that text. This continued dishonesty further

underscores the severity of the situation and the breach of trust.

14. **Actions Taken Regarding Lisa Filippini:** Upon learning of Ms. Filippini's fraudulent conduct, I took swift action to address it and to terminate my attorney-client relationship with her. Specifically:

- On October 13, 2025, I filed a Motion for Leave to Withdraw as counsel for Lisa Ann Filippini in her Chapter 13 case (Case No. 25-16171 (JKS)).

- I filed a Notice of Fraudulent Conduct by Debtor in Ms. Filippini's case, formally informing the Bankruptcy Court, the Standing Chapter 13 Trustee, and all parties in interest of her forgery and related misconduct.

- I sent Ms. Filippini a cease-and-desist letter, in which I terminated our attorney–client relationship, instructed her to cease any further use of my name, and demanded that she preserve all evidence related to the forgery and any other potential fraud.

- I advised Ms. Filippini in writing that she must immediately retain substitute bankruptcy counsel to represent her going forward.

15. Ms. Filippini has thus been unequivocally **put on notice** that her actions were unlawful and that I am no longer her attorney. She has been directed to preserve all evidence of her actions. These steps were necessary to protect the integrity of the judicial process and to mitigate further harm.

16. **Conflicts of Interest Requiring Withdrawal from Representing Diana Kemp:** Although Diana Kemp herself did not participate in the forgery or any fraudulent conduct, her daughter's actions have created multiple irreconcilable **conflicts of interest** that make it impossible for me to continue representing Ms. Kemp. The New Jersey Rules of Professional Conduct (RPC) and my duties to the Court compel my withdrawal under these circumstances, as detailed below.

17. **Personal-Interest Conflict – Victim of a Client's Wrongful Act:** I have been

6

personally victimized by Ms. Filippini's forgery of my name. My own professional reputation has been directly harmed by having my name falsely used to threaten a third party. I intend to pursue legal remedies against those responsible – namely Ms. Filippini and Larry Stetze, CPA – for this egregious misconduct. These remedies may include criminal complaints, ethics grievances, reports to law enforcement or regulatory agencies, and civil actions (for defamation, intentional infliction of emotional distress, and other applicable torts).

18. As a result, my **personal interests** as a victim of Ms. Filippini's wrongdoing are now in conflict with Diana Kemp's interests as Ms. Filippini's mother. Ms. Kemp's interests are naturally aligned with protecting or minimizing consequences for her daughter. This dynamic inherently clashes with my intention to hold Ms. Filippini accountable for her actions. In short, a personal-interest conflict now exists between me (as an aggrieved victim seeking redress) and my client Ms. Kemp (whose familial loyalty lies with the wrongdoer). I cannot ethically continue to represent Ms. Kemp under these conditions.

19. **Lawyer as Witness (N.J. RPC 3.7):** I am likely to be a **necessary witness** in any proceedings arising from these events. For example, I possess first-hand knowledge regarding:

- The circumstances of the October 4, 2025 forgery (how the letter was delivered and discovered);

- Ms. Filippini's verbal admissions to me about orchestrating the letter;

- The content and context of Ms. Filippini's October 12, 2025 text message to me;

- The relationship and interactions between Ms. Filippini and Ms. Kemp that may be relevant (e.g. information about the business ownership issue);

- The issues concerning the ownership of Lisa's Priceless Pets, LLC as they relate to both the Kemp and Filippini bankruptcy cases.

New Jersey RPC 3.7(a) provides:

> A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client.

> A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client.

20.     **"Taint by Association" – Credibility Concerns for Diana Kemp:** Even if Diana Kemp herself has been truthful, her close association with Lisa Filippini now **taints Ms. Kemp's credibility** in the eyes of the Court and other parties. Ms. Filippini has demonstrated a willingness to lie, forge documents, and engage in fraud. By extension, anything said or done by Ms. Filippini's mother (Ms. Kemp) in these related proceedings will be viewed with skepticism. Indeed, Ms. Kemp's testimony at her Meeting of Creditors regarding the ownership of Lisa's Priceless Pets is now under a cloud of doubt because:

- Ms. Kemp is the mother of a person who has committed fraud during the bankruptcy process;

- Ms. Filippini's proven willingness to deceive naturally calls into question whether false information may have been presented in Ms. Kemp's case as well;

- Specifically, Ms. Filippini's conduct raises legitimate questions about whether Diana Kemp was completely candid about her purported lack of ownership in Lisa's Priceless Pets, LLC. (Ms. Kemp has denied owning 50% of the business,

>contrary to what creditor Reilly alleges, but now any such denial will be scrutinized in light of her daughter's behavior.)

Because one client's (Ms. Filippini's) misconduct undermines the credibility of another client (Ms. Kemp), I cannot effectively advocate for Ms. Kemp. The situation creates an unacceptable risk that I would be advancing information that may later be impeached or questioned due to the **stain of fraud** by Ms. Kemp's close family member.

21. **Duty of Candor to the Tribunal (N.J. RPC 3.3):** As an attorney, I owe an overriding duty of **candor to the Court**. Given what has transpired, I cannot fulfill that duty while continuing to represent Ms. Kemp. Ms. Filippini's fraudulent actions occurred during the pendency of these bankruptcy cases and relate to matters at issue (such as the ownership of the business). Her conduct casts doubt on the truthfulness of representations made in both her case and in Ms. Kemp's case. I have personal knowledge of the **true facts** of the forgery and Ms. Filippini's admissions, which I have a duty to disclose to the Court and relevant parties (as evidenced by the Notice of Fraud I filed). In representing Ms. Kemp, however, I would be constrained by my obligation to advocate for her interests, which could conflict with my obligation to be fully candid about information that might implicate or embarrass Ms. Kemp (by virtue of her relationship to the wrongdoer). This is an untenable position. I cannot simultaneously shield Ms. Kemp and divulge all pertinent information to the Court without compromising one duty or the other. Thus, continuing to represent Ms. Kemp would likely lead to a breach of RPC 3.3.

22. **Conflict Between Two Clients (N.J. RPC 1.7):** I have (until now) represented both Lisa Filippini and Diana Kemp. In light of recent events, it is clear that the interests of these two clients have become **directly adverse**. I have already taken actions against the interests of Ms. Filippini (reporting her fraud to the Court and authorities). Those actions, by extension, impact Ms. Kemp – at minimum, they jeopardize her daughter's legal well-being and could indirectly affect Ms. Kemp's case (as discussed above). Ms. Kemp's natural inclination as a mother is to defend or support her daughter, which conflicts with my ethical obligations to report Ms. Filippini's misconduct and ensure it is fully addressed. Under **RPC 1.7(a)**, a lawyer cannot represent a client if that representation is directly adverse to another client, unless each client

gives informed consent confirmed in writing (an exception that is neither sought nor feasible here). The conflict here is unwaivable: Ms. Filippini's and Ms. Kemp's interests in this scenario are fundamentally at odds. Thus, my continued representation of Diana Kemp would violate RPC 1.7.

23. **Prohibition Against Assisting Fraud (N.J. RPC 1.2(d)):** New Jersey RPC 1.2(d) provides that *"a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent."* Although Diana Kemp herself has not engaged in any known criminal or fraudulent conduct, the environment created by her daughter's actions puts me at risk of **assisting fraudulent conduct by association**. Continuing to represent Ms. Kemp while her daughter engages in ongoing deceit (e.g. the October 12 text, which may be an attempt to cover up a fraud) would place me in an ethically compromised position. I have an affirmative duty to report Ms. Filippini's criminal conduct to the appropriate authorities, which I have done and will continue to do. However, doing so will inevitably be detrimental to Ms. Kemp's familial interests and perhaps her legal interests if, for instance, investigations spill over into her bankruptcy matters. I cannot be in the position of potentially *facilitating or ignoring* fraudulent behavior by remaining silent or inactive. RPC 1.2(d) forbids lawyers from assisting in wrongdoing; by withdrawing, I remove myself from any implication that I condone or overlook the ongoing misconduct in Ms. Kemp's milieu.

24. **Mandatory Withdrawal – N.J. RPC 1.16(a):** The Rules of Professional Conduct make clear that in certain situations a lawyer's withdrawal is not optional, but required. RPC 1.16(a)(1) mandates that a lawyer **shall withdraw** from representation if "the representation will result in violation of the Rules of Professional Conduct or other law." In this case, as outlined above, my continued representation of Diana Kemp would result in multiple

11

RPC violations – including RPC 1.7, RPC 3.3, RPC 3.7, and RPC 1.2(d). Because these serious ethical breaches would be unavoidable if I remained in the case, my withdrawal is **mandatory** under RPC 1.16(a). This is not a situation where a lawyer merely *may* withdraw due to a potential conflict – rather, I have no choice **but to withdraw** given the circumstances. I respectfully submit that the Court should therefore relieve me as counsel for Ms. Kemp in accordance with this ethical obligation.

25.     **Impact of Lisa Filippini's Misconduct on the Bankruptcy Proceedings:** Ms. Filippini's forgery and related dishonest conduct have significant implications for both her own Chapter 13 case and Diana Kemp's case:

- **Ownership Dispute:** As noted, creditor Shannon Reilly contends that Diana Kemp holds a 50% ownership stake in Lisa's Priceless Pets, LLC, whereas Lisa Filippini swears she is the sole owner. Now that Ms. Filippini has demonstrated a propensity for fraud, any of her statements regarding the business (or any other material issue) lack credibility. If in reality Diana Kemp *does* have an undisclosed ownership interest in the business, that would mean her bankruptcy filings may be incomplete or inaccurate – a serious issue for the administration of her case. On the other hand, if Ms. Kemp truly has no ownership, we must consider whether Ms. Filippini's word on the subject can be trusted. Either way, the forgery incident casts doubt on the truth of the information presented in both cases, and it may necessitate further investigation by the Trustee and creditors.

- **Credibility of Debtor (Diana Kemp):** By virtue of her close relationship with Ms. Filippini, Ms. Kemp's own credibility is now under heightened scrutiny. At her §341 Meeting, Ms. Kemp likely faced questions about the business ownership issue. Any testimony she gave is now viewed through the lens of her daughter's proven misconduct. Creditors and the Chapter 13 Trustee in Ms. Kemp's case have a legitimate interest in knowing about Ms. Filippini's fraudulent behavior, because it could be probative of whether Ms. Kemp has been fully candid and forthcoming in her case. In essence, the taint from Lisa Filippini's actions spills into Diana Kemp's bankruptcy, potentially affecting the administration of Ms. Kemp's estate and any proceedings (such as plan confirmation) that rely on the debtor's honesty and accuracy of disclosures.

26. **Interference by Opposing Counsel – Defamatory Email of October 16, 2025:** In the midst of dealing with these issues and preparing the present motion to withdraw, I unfortunately also had to address a highly inappropriate and defamatory correspondence from opposing counsel in a related matter. On October 16, 2025, **Jeffrey M. Eilender, Esq.** (counsel affiliated with the firm Schlam Stone & Dolan, LLP, who represents an interested party in the broader dispute) sent an email to me at 12:51 p.m. that day, containing false, outrageous accusations against me. In that email, Mr. Eilender accused me of engaging in "inappropriate" communications with a young female associate at his firm – a baseless and highly offensive allegation implying some form of harassment or sexual misconduct on my part. Such an accusation is **defamatory per se** under New Jersey law, as it imputes conduct incompatible with my profession *(see Ward v. Zelikovsky, 263 N.J. Super. 497, 505 (App. Div. 1993); Hall v. Heavey, 195 N.J. Super. 590, 595 (App. Div. 1984)) and would, if believed, amount to a serious ethical violation. Mr. Eilender's email went further to compare my conduct or communication style to that of someone with a severe intellectual disability (invoking a deeply derogatory personal analogy involving his own disabled daughter). He then stated, in substance:* "If you are going to withdraw, great. If not, who cares. But can you avoid troubling us and just keep it in your head?"* Such remarks were unprofessional, insulting, and demonstrated a disturbing disregard for the serious ethical obligations I was in the process of addressing.

27. Upon receiving this email, I initially misidentified its author – I thought another attorney (David Goldsmith) had written it, given that Mr. Eilender's email was sent from a discussion including Mr. Goldsmith. I sent a formal demand for retraction to Mr. Goldsmith in error. Mr. Eilender quickly responded, clarifying that **he** was in fact the author of the defamatory email. Accordingly, on October 16, 2025, I prepared a **Corrected Demand for Immediate**

13

**Retraction and Apology** letter directed to Mr. Eilender. In that letter, I outlined the falsity of his accusations, the legal seriousness of his statements, and the damage caused to my reputation. I demanded that he retract the statements and issue a proper apology. A true copy of this Corrected Demand Letter (with enclosures) is attached as **Exhibit C** to this Certification.

28.  **Impact of Mr. Eilender's Email on these Proceedings:** Mr. Eilender's defamatory attack did more than just defame me personally – it **interfered directly with my professional duties** in this case and caused delay in my completion of the withdrawal motion. To elaborate, on October 15, 2025, I had informed Mary Krieger, Esq., of the Standing Chapter 13 Trustee's office that I would have Diana Kemp's withdrawal motion papers completed and filed by approximately 3:00 a.m. on October 16, 2025. I worked late into the night of October 15 (until around 3:30 a.m. on October 16) drafting the motion and supporting brief, but I still had a few remaining portions to finalize on October 16. While I was in the midst of this task – already slightly behind my hoped-for schedule due to the complexity of the issues – Mr. Eilender's email arrived just before 1:00 p.m. on October 16, 2025.

29.  The nature of Mr. Eilender's email required an immediate and time-consuming response. His false accusations (particularly the suggestion of improper conduct toward a colleague) struck at the core of my professional integrity and demanded prompt rebuttal to mitigate ongoing harm. I was forced to set aside the nearly-completed withdrawal motion for Diana Kemp in order to: (a) thoroughly review and document all of my communications with the associate in question (to confirm that they were entirely appropriate, as I knew them to be); (b) research applicable defamation law – especially the distinction between actionable false statements and any claimed "opinion" – to properly respond to Mr. Eilender's contentions; and (c) draft the detailed demand letter (Exhibit C) addressing the situation. In other words, Mr.

14

Eilender's unwarranted attack diverted a substantial portion of my day on October 16, 2025 to addressing a personal and professional crisis that he unnecessarily created.

30. As a result of this diversion, I was unable to finish and file Ms. Kemp's withdrawal motion on the timeline I had intended. The **filing of the motion was delayed** because of the hours I had to devote to combating Mr. Eilender's defamatory email. Every hour of delay in bringing this motion is prejudicial to the administration of justice: it prolongs a situation where a conflicted attorney remains on the record. Opposing counsel's interference thus not only harmed me, but also impeded the swift resolution of the representation issues before the Court. I am bringing this to the Court's attention because it is relevant to explain any timing issues in the filing of the motion and to make clear that any minor delay was caused by factors outside my control, namely, the deliberate actions of opposing counsel.

31. **No Prejudice to Parties from Withdrawal:** Allowing me to withdraw as counsel for Diana Kemp will not prejudice Ms. Kemp or any other interested party, nor will it unduly disrupt the progress of this case. In fact, withdrawal is likely to benefit the administration of the case by ensuring that Diana Kemp is represented by conflict–free counsel. I note the following points:

- **Substitute Counsel Opportunity**: Diana Kemp will have adequate time (at least 30 days, and more if the Court permits) to retain substitute bankruptcy counsel. I will not leave her without representation at a critical juncture – indeed, I seek an orderly transition.

- **No Imminent Critical Deadlines:** There are no imminent deadlines or scheduled court proceedings in this case (aside from a confirmation hearing) that would be adversely impacted by my withdrawal. If the confirmation hearing or any other matter is approaching, the Court can reschedule it to allow new counsel to get up to speed. The case is not on the verge of dismissal, nor is it in the middle of trial or anything irreversible.

- **Orderly Transition:** I am committed to cooperating fully with Ms. Kemp's new attorney (once retained) to ensure a smooth transition. I will promptly transfer files, communicate information needed, and assist in any way appropriate to help new counsel assume representation without delay.

- **Managed Impact:** Any potential impact on the case from changing counsel can be managed through proper coordination. The Standing Trustee and creditors will be informed of the change. The Court can set status checks as needed. In short, the proceedings can continue with minimal interruption once new counsel is in place.

32.     It is important to emphasize that any inconvenience to Ms. Kemp resulting from my withdrawal is a direct consequence of her **daughter's misconduct**, not of any neglect on my part. I did not create the conflict; to the contrary, I have done everything in my power to address it responsibly. Ms. Kemp cannot be heard to claim unfair prejudice when it is the fraudulent actions of her own daughter that have necessitated my withdrawal. My paramount concern is to uphold my ethical duties and protect the integrity of this Court's process.

33.     **Notice to Debtor (Diana Kemp):** I will provide Diana Kemp with clear notice of my withdrawal and this motion. Specifically, I am serving Ms. Kemp with a copy of these motion papers (including this Certification), as reflected in the accompanying Certification of Service. Additionally, I am sending Ms. Kemp a separate letter advising her that she *must promptly retain new bankruptcy counsel* to take over her representation. I have explained to her, and will continue to emphasize, that because of the conflicts described herein I can no longer represent her and that it is in her best interest to have another attorney continue the case. In sum, Ms. Kemp has been made fully aware of the situation and the need for my withdrawal, and she will be kept informed throughout this process.

34. **Necessity of Full Disclosure to the Court:** I am cognizant that the details set forth in this Certification – particularly regarding Ms. Filippini's fraudulent conduct – are unusual and potentially damaging facts to air. However, it is my firm belief that disclosing these facts to the Court is both **necessary and appropriate** under the circumstances, for several reasons:.

- **Court Must Understand the Conflict:** The Court cannot fairly decide a motion to withdraw, especially one that is effectively mandatory, without understanding the specific reasons behind it. Simply citing a generic "conflict of interest" would not do justice to the gravity of the situation. By providing full detail, I enable the Court to appreciate why RPC 1.16(a) is triggered and why withdrawal is the only ethical option.

- **Forged Letter's Relevance:** The misconduct by Ms. Filippini (forgery, fraud, and attempts at cover-up) has a direct bearing on both bankruptcy cases, as discussed. It undermines confidence in the information and testimony presented. Omitting these details would risk leaving the Court and other parties in the dark about a critical development that affects case administration.

- **Duty to Inform Interested Parties:** The Chapter 13 Trustee, the U.S. Trustee, and creditors in Diana Kemp's case all have a legitimate right to be informed of Ms. Filippini's actions. Those actions could influence decisions in Ms. Kemp's case (for instance, creditors may take a different position on plan confirmation or other matters knowing that the debtor's daughter engaged in fraud that might relate to the debtor's financial affairs). Transparency ensures that all parties can act with full knowledge of the pertinent facts.

- **Ethical Transparency:** As an officer of the Court, I have an ethical duty to be transparent when a situation arises that affects my ability to continue representation. Hiding the reason for withdrawal behind vague statements would be improper, especially when the reason involves serious misconduct. I have approached this matter with the honesty required by the circumstances, ensuring the Court is fully informed.

- **Crime–Fraud Exception to Privilege:** Normally, communications between a client and attorney are privileged. However, communications or acts in furtherance of a crime or fraud are not protected. Here, Ms. Filippini's forging of my signature is a crime under New Jersey law (forgery, in violation of N.J.S.A. § 2C:21-1), and her October 12 text message could be viewed as part of an attempt to cover up that crime (potential obstruction of justice). To the extent any attorney-client communications relate to that fraudulent activity, they fall under the crime-fraud exception and are not privileged. Thus, I am permitted – indeed, obligated – to reveal them in order to prevent the Court from being misled. Disclosing this information in a public court filing is appropriate given its relevance and the exception to privilege.

35. **Commitment to Cooperate with Substitute Counsel:** If and when the Court grants this motion, I will do everything reasonably possible to facilitate the transfer of the case to Diana Kemp's new attorney. This includes:

- Promptly turning over Ms. Kemp's files and documents to the new attorney, so they have all pleadings, correspondence, and information needed to represent her without missing a beat;

- Making myself available to confer with the new attorney to answer any questions and to brief them on the history and status of the case (and the related Filippini case), ensuring they understand the key facts and issues;

- Working with new counsel and the Chapter 13 Trustee to reschedule or adjourn any pending matters (such as the confirmation hearing) as necessary to give new counsel time to prepare, and otherwise taking steps to minimize any disruption;

- Cooperating fully and in good faith in all respects to effectuate an orderly, efficient transition of the representation.

Even as I seek to withdraw, I remain dedicated to protecting Ms. Kemp's interests to the greatest extent possible during the transition. My withdrawal, though required, will be carried out in a responsible manner so that Ms. Kemp is not prejudiced.

36. **Conclusion:** The events described above – most notably, Lisa Ann Filippini's forgery of my name and her subsequent dishonest behavior – have created an array of conflicts and ethical dilemmas that make my continued representation of Diana Kemp untenable. I cannot be both a victim and an advocate in this context; I cannot be a witness and also Ms. Kemp's attorney; I cannot ignore one client's fraud while representing the related client; and I cannot fulfill my duties to the Court under these conditions. The New Jersey Rules of Professional Conduct *mandate* that I withdraw. For these reasons, I respectfully request that the Court **grant my Motion to Withdraw** as counsel for Diana Kemp. I will cooperate in every way to ensure a smooth transition to new counsel for the debtor.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: October 19, 2025        By:    /s Jonathan Stone_____
                                       Jonathan Stone, Esquire
                                       Attorney for Debtor